1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| 11  U.S. INSPECTION SERVICES, INC., | No. C-10-mc-80083-CRB (DMR) |
| 12         Plaintiff, | **ORDER RE MOTION TO QUASH THIRD PARTY SUBPOENA** |
| 13      v. | |
| 14  NL ENGINEERED SOLUTIONS, LLC, et al., | |
| 15         Defendants. | |

————————————————/

16  GREAT DANE LIMITED PARTNERSHIP,

17         Plaintiff,

18      v.

19  FULKS-GRAHAM HOLDING CO. f/k/a
20  U.S. INSPECTION SVCS., INC., et al.,

21         Defendants.

————————————————/

22
23

24      This matter arises out of the issuance of a subpoena *duces tecum* under Rule 45 of the

25  Federal Rules of Civil Procedure upon a non-testifying expert consultant, Exponent Failure

26  Analysis Associates ("Exponent"). Intervening Plaintiff Great Dane Limited Partnership ("Great

27  Dane") has moved to quash the subpoena. Defendant Fulks-Graham Holding Co. ("Fulks-

28  Graham") opposes the motion to quash.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel presented during the June 24, 2010 hearing, the Court hereby GRANTS Great Dane's Motion to Quash Third Party Subpoena.

## I.  <u>BACKGROUND</u>

 In November 2006, Fulks-Graham (formerly known as U.S. Inspection Services, Inc.), initiated an action in the Southern District of Ohio seeking declaratory judgment against NL Engineered Solutions, LLC ("NLES") and Indiana Metal Treating, Inc. ("Indiana Metal Treating").

On June 24, 2009, Great Dane intervened in the action by filing claims for, *inter alia*, breach of contract, breach of warranty, and negligence against NLES, Indiana Metal Treating, and Fulks-Graham.  *See* Docket No. 7 (Affidavit of Christine Huntoon, Exh. A, Complaint).  In its suit, Great Dane alleged that NLES sold defective kingpins – metallic devices which provide a coupling point between an over-the-road tractor and a semi-trailer – to Great Dane.  *See id*. (Huntoon Aff., Exh. A, Complaint ¶ 7).  NLES, in turn, had entered into service contracts with Indiana Metal Treating and Fulks-Graham for heat treating and inspection of the kingpins it had sold to Great Dane.  *See id*. (Huntoon Aff., Exh. A, Complaint ¶¶ 8-9).  According to Great Dane, the defective kingpins, which failed to meet Great Dane's hardness specifications, had been improperly heat-treated by Indiana Metal Treating and improperly inspected by Fulks-Graham.  *See id*. (Huntoon Aff., Exh. A, Complaint ¶¶ 13-21).  Pursuant to its obligations under the National Highway & Traffic Safety Act ("NHTSA") and the regulations of the National Highway & Traffic Safety Administration ("Agency"), Great Dane informed the Agency of the kingpins' safety-related defects and initiated a recall of all semi-trailers that contained the defective kingpins.  *See id*. (Huntoon Aff., Exh. A, Complaint ¶¶ 22-26).  Consequently, Great Dane claims it has incurred and will continue to incur considerable expenses in order to conduct the recall, and alleges that NLES, Indiana Metal Treating, and Fulks-Graham are jointly and severally liable to Great Dane for damages.   *See id*. (Huntoon Aff., Exh. A, Complaint ¶¶ 29-34, 42, 47, 53, 60, 67).

On July 7, 2009, Great Dane's counsel engaged the technical services of Exponent, located in Menlo Park, California.  Specifically, Exponent was retained to provide Great Dane's counsel with a technical analysis of whether the "Brinell hardness range set by the American Association of Railroads...is appropriate for a tractor-trailer kingpin, or if higher values of hardness may be suitable."  *See* Docket No. 13-1 (Affidavit of John Hewson, Exh. 1, Letter from Exponent to Hewson (hereinafter "Engagement Letter") at 1).  Although Fulks-Graham and Great Dane agree that Exponent was hired at least in part to assist counsel in advising Great Dane on the recall, they dispute whether Exponent was also retained in connection with the pending litigation in Ohio.  Great Dane has not designated Exponent as a testifying expert.  *See* Docket No. 13 (Hewson Aff. ¶ 13).

On March 23, 2010, Fulks-Graham issued a subpoena *duces tecum* in this district, demanding that Exponent produce various documents by April 16, 2010, including testing records, analyses, reports, photographs, samples, and raw data related to Exponent's analysis of kingpins for Great Dane.  *See* Docket No. 7 (Huntoon Aff., Exh. F).  On April 14, 2010, Great Dane moved to quash the subpoena.

## II.  **DISCUSSION**

Great Dane has moved this court for an order quashing the third party subpoena issued upon Exponent under Rule 45, on two grounds: (1) the subpoena seeks information from a non-testifying expert retained in anticipation of litigation and thus protected from discovery by Rule 26(b)(4)(B); and (2) the subpoena seeks trial preparation material protected by the work product doctrine under Rule 26(b)(3).

Fulks-Graham opposes the motion to quash based on the following arguments: (1) Exponent was not hired "in anticipation of litigation" so the protections under either Rule 26(b)(4)(B) or Rule 26(b)(3) are not triggered; (2) exceptional circumstances exist to justify production of the documents, due to the purported destruction of evidence and Fulks-Graham's putative inability to access information which Fulks-Graham asserts has increased its exposure to damages; and (3) Great Dane has waived any such protections by voluntarily disclosing certain

documents related to Exponent's work and by failing to object when Fulks-Graham questioned a Great Dane witness about Exponent.[1]

As set forth fully below, the Court orders that the third party subpoena be quashed.  With respect to the documents for which Great Dane asserts protection under Rule 26(b)(4)(B) as information known to a non-testifying expert, the Court finds that Exponent was retained "in anticipation of litigation," as this phrase has been defined by controlling Ninth Circuit precedent, that exceptional circumstances do not exist to justify their production, and that Great Dane has not waived protection under Rule 26(b)(4)(B) for the documents that have not yet been disclosed.  With respect to the one document for which Great Dane claims work product protection, the Court finds that this document was created "in anticipation of litigation," that Fulks-Graham has not demonstrated any substantial need for its production, and that Great Dane has not waived work product protection.

A.   **Fed.R.Civ.P. 26(b)(4)(B) and Non-Testifying Experts.**

Under Rule 45(c)(3)(A)(iii), a court must quash a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies."[2]  Fed.R.Civ.P. 45(c)(3)(A)(iii).  In turn, Great Dane points to Rule 26(b)(4)(B) as the basis for denying discovery of all but one of the documents sought through the subpoena.

Rule 26(b)(4)(B) provides:

---

[1]  As part of its reply brief, Great Dane submitted a privilege log listing 40 documents.  *See* Docket No. 13-2 (Hewson Aff. ¶ 15, Exh. 2).  Of those documents, Great Dane asserts that 39 are protected as "information known to [a] non-testifying expert," and identifies only one document as sheltered by work product.  *See id.*  Based on the submission of the privilege log, Fulks-Graham dropped its claim at oral argument that a waiver should be found due to Great Dane's previous failure to provide a log.

[2]  As a preliminary matter, this Court applies federal law in resolving the claims asserted by Great Dane.  Because the work product doctrine and protection accorded to non-testifying experts are not evidentiary privileges but rather, procedural limitations on discovery, the scope of these asserted protections is determined by federal law, even when the federal court sits in diversity.  *See Mitchell Engineering v. City & County of San Francisco*, No. C 08-04022 SI, 2010 WL 1853493, at *2 (N.D. Cal. May 6, 2010); *Great American Assurance Co. v. Liberty Surplus Ins. Corp.*, 669 F. Supp. 2d 1084, 1090 (N.D. Cal. 2009).

Ordinarily, a party may not, by interrogatories or deposition,[3] discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.  But a party may do so only:

(I)     as provided in Rule 35(b);[4] or
(ii)    on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Thus, Rule 26(b)(4)(B) "creates a safe harbor whereby facts and opinions of non[-]testifying, consulting experts are shielded from discovery, except upon a showing of exceptional circumstances."  *PlymoVent Corp. v. Air Tech. Solutions, Inc.*, 243 F.R.D. 139, 143 (D. N.J. 2007).  The party asserting an applicable protection bears the initial burden of showing that the protection applies.  *See United States v. 22.80 Acres of Land*, 107 F.R.D. 20, 21 (N.D. Cal. 1985).  Once that initial burden is met, the party seeking discovery from a non-testifying expert carries a heavy burden of proving the existence of exceptional circumstances.  *See Oki America, Inc. v. Advanced Micro Devices, Inc.*, No. C 04-3171 CRB (JL), 2006 WL 2987022, at *2 (N.D. Cal. Sept. 27, 2006); *Vanguard Savings & Loan Ass'n v. Banks*, No. CIV.  A. 93-4627, 1995 WL 71293, at *3 (E.D. Pa. Feb. 17, 1995).  The burden of proving any claimed waiver of protection also rests on the party seeking discovery.  *Johnson v. Gmeinder*, 191 F.R.D. 638, 643 (D. Kan. 2000) (where claim of protection arises under Rule 26(b)(4)(B), burden of proof is on party asserting waiver).

Counsel for Great Dane has attested that it has not designated Exponent as a testifying expert in this case.  *See* Docket No. 13 (Hewson Aff. ¶ 13).  Fulks-Graham does not dispute this point, nor that the documents are protected under Rule 26(b)(4)(B) because they are "facts

---

[3]  Rule 26(b)(4)(B) does not explicitly mention document requests.  Fulks-Graham does not contest the point that Rule 26(b)(4)(B) applies with equal force to protect *documents* sought from non-testifying experts.  *See, e.g.*, *PlymoVent Corp. v. Air Tech. Solutions, Inc.*, 243 F.R.D. 139, 143-44 (D.N.J. 2007); *Hollinger Int'l, Inc. v. Hollinger, Inc.*, 230 F.R.D. 508, 519 (N.D. Ill. 2005); *Ludwig v. Pilkington N. America, Inc.*, No. 03 C 1086, 2003 WL 22242224, at * 1 (N.D. Ill.  Sept. 29, 2003) (explaining that Rule 45 cannot be utilized for obtaining an expert's files where Rule 26(b)(4)(B) remains the limitation on discoverability) (citation omitted)).

[4]  Rule 35(b) pertains to examiner's reports of physical and mental examinations and is not applicable here.

5

known or opinions held" by Exponent.  Fulks-Graham's sole argument against the applicability of Rule 26(b)(4)(B) is that Exponent was not in fact retained in anticipation of litigation.  *See* Docket No. 6 (Opp'n at 4-7).  Therefore, to prevail on its claim that the documents sought are protected from discovery under Rule 26(b)(4)(B), Great Dane must first establish it retained Exponent in anticipation of litigation.  The burden then falls on Fulks-Graham to demonstrate that either exceptional circumstances compel discovery or that waiver is appropriate in these circumstances.

       1.    "In anticipation of litigation."

     The pivotal question before this Court, to which the parties devoted most of their written and oral argument, is whether Exponent was retained "in anticipation of litigation."  *See* Fed.R.Civ.P. 26(b)(4)(B).  Both parties cite to *In re Grand Jury Subpoena (Mark Torf)*, 357 F.3d 900 (9th Cir. 2003), in support of their respective positions.

     In *In re Grand Jury Subpoena (Mark Torf)*, the Ninth Circuit examined the applicability of the work product doctrine under Rule 26(b)(3)[5] to documents prepared by an environmental consultant hired by an attorney who had been retained by a party ("Ponderosa") to advise and defend it in anticipated litigation with the government.  *See In re Grand Jury Subpoena (Mark Torf)*, 357 F.3d at 905-06.  After the EPA notified Ponderosa that it was under investigation for unlawful transportation and disposal of hazardous substances, the consultant conducted interviews and an investigation to assist the attorney in mounting a legal defense.  *Id.*  Information collected by the consultant was used to respond to an EPA Information Request, a reporting requirement independent of the anticipated litigation.  *Id.*  Two years later, a grand jury investigating Ponderosa issued a subpoena to the consultant for the production of all records relating to the disposal of waste by Ponderosa.  *Id.* at 906.  Arguing that the documents were

---

    [5] Although *In re Grand Jury Subpoena* dealt with work product protection under Rule 26(b)(3), the same analysis should apply to the phrase "in anticipation of litigation" under Rule 26(b)(4)(B).  *See, e.g.*, *Klee v. Whirlpool Corp.*, 251 F.R.D. 507, 511-12 & n.3 (S.D. Cal. 2006); *Hollinger*, 230 F.R.D. at 520-21.  *See also In re PolyMedica Corp. Securities Litigation*, 235 F.R.D. 28, 30-31 (D. Mass. 2006) (importing analysis of the phrase "in anticipation of litigation" under Rule 26(b)(3) to Rule 26(b)(4)(B), "[g]iven the similar language" in both Rules).

protected under the work product doctrine, Ponderosa intervened and moved to quash the subpoena. *Id.*

Given this backdrop, the Ninth Circuit found that certain documents sought under the subpoena served a "dual purpose" in that they were prepared under the direction of an attorney in anticipation of litigation with the government *and* in compliance with the EPA Information Request. *See id.* at 907-08. Adopting the "because of" standard articulated in the Wright & Miller Federal Practice treatise, the Ninth Circuit reasoned: "[The attorney] hired [the consultant] because of Ponderosa's impending litigation and [the consultant] conducted his investigations because of that threat. The threat animated every document [the consultant] prepared, including the documents prepared to comply with the Information Request...." *Id.* at 908. Indeed, it was the anticipation of litigation that "prompted" the consultant's work "in the first place." *Id.* at 909.

Thus, the documents were entitled to work product protection under Rule 26(b)(3) because "taking into account the facts surrounding their creation, their litigation purpose so permeate[d] any non-litigation purpose that the two purposes [could not] be discretely separated from the factual nexus as a whole." *Id.* at 910. Consequently, protection from discovery inures when the so-called independent non-litigation purpose is "grounded in the same set of facts that created the anticipation of litigation," but is less likely when the non-litigation purpose is "truly separable." *See id.* at 908-09. In other words, the "because of" standard "does not consider whether litigation was a primary or secondary motive" but looks to the "totality of the circumstances." *Id.* at 908.

Accordingly, district courts have employed the "because of" standard to interpret the phrase "in anticipation of litigation" in the context of the protection afforded non-testifying experts under Rule 26(b)(4)(B). In so doing, courts have weighed factors such as the timing of retention of the non-testifying expert in relation to the litigation at issue and the existence of

evidence including supporting affidavits and engagement letters.[6]

In *Hollinger Int'l, Inc. v. Hollinger, Inc.*, a case cited by Great Dane, the court applied the reasoning of *In re Grand Jury Subpoena (Mark Torf)* in holding that undisclosed portions of a non-testifying expert's report were protected by Rule 26(b)(4)(B).  230 F.R.D. 508, 520-22 (N.D. Ill. 2005).  This was so even though the report arguably served a dual purpose because it was relied on as part of a special committee report mandated by a consent decree.  *Id.* at 521.  The court noted that the special committee report incorporating the expert report "arose out of the same set of circumstances that created the anticipation of litigation." *Id.* at 521.  In finding that the expert was retained and the report was therefore prepared in anticipation of litigation, the court considered a supporting declaration filed by counsel and examined when the non-testifying expert was retained.  *Id.* at 520.  As part of its analysis, the court commented that two pieces of litigation were "ongoing" when the expert was contacted by counsel and that a third piece of litigation had been filed by the time the expert was formally retained.  *Id.*  The court also found that status as a non-testifying expert was not altered by the fact that the engagement letter did not explicitly state the expert was retained in anticipation of litigation but rather to provide technical services and analysis.  *Id.* at 521 & n.15.

Similarly, in *In re PolyMedica Corp. Securities Litigation*, the court found that a non-testifying expert was retained "in anticipation of litigation" after examining the engagement letter and the timing of the expert's retention relative to the inception of the lawsuit.[7]  235 F.R.D.

---

[6]  Analogously, courts interpreting work product protection under Rule 26(b)(3) have found that "a party may satisfy its burden of showing anticipation of litigation in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge...." *United States v. Roxworthy*, 457 F.3d 590, 597 (6th Cir. 2006) (internal quotation omitted); *see also United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1082-83 (N.D. Cal. 2002) (adopting "because of" test and accepting party's "general assertion, supported by competent declarations, that the proffered anticipation of litigation was real"). However, a party fails to meet this burden where the "only basis" for the claim of protection is an affidavit containing conclusory statements.  *Roxworthy*, 457 F.3d at 597 (citation omitted).

[7]  In making this determination, the district court applied in part the First Circuit's "because of" test.  The court indicated that the First Circuit has also adopted the "because of" standard set forth in the Wright & Miller Federal Practice treatise.  *See In re PolyMedica Corp.*,

28, 31-32 (D. Mass. 2006).  The court emphasized that when counsel retained the non-testifying expert, "litigation was not merely possible, it had already begun."  *Id.* at 31-32.  Moreover, as evidence in support of the assertion that the expert was hired "in anticipation of litigation," the court pointed to the engagement letter submitted as an exhibit to counsel's affidavit – even though the language of the letter "may [have been] self-serving" because it indicated the expert was retained "to assist in...giving legal advice" to the defendants.  *Id.* at 31.

Here, to address the question of whether Exponent was hired "in anticipation of litigation" under Rule 26(b)(4)(B), this Court is guided by the "because of" standard set forth by the Ninth Circuit in *In re Grand Jury Subpoena (Mark Torf)*, and finds instructive district court cases including *Hollinger* and *In re PolyMedica Corp.* that have applied the "because of" standard to Rule 26(b)(4)(B).  Accordingly, this Court has considered the totality of the factual circumstances in this case, based on sworn affidavits from Great Dane's counsel and Exponent's engagement letter, proffers made on the record by counsel at oral argument, and the intervening complaint itself – all of which establish that Exponent was retained "in anticipation of litigation" even though its retention served a dual purpose of assisting with the recall.

First, the Court finds operative the timing of Exponent's retention by counsel for Great Dane.  Fulks-Graham does not dispute that when Exponent was hired by Great Dane, the instant litigation was not merely anticipated, it had already begun.  *See*, *e.g.*, *Hollinger*, 230 F.R.D. at 520; *In re PolyMedica Corp.*, 235 F.R.D. at 31.  As Fulks-Graham itself points out, Great Dane initiated the recall of defective kingpins in or around December 2008.  *See* Docket No. 6 (Opp'n at 2).  Exponent was not a consultant for Great Dane at that time.  On June 24, 2009, Great Dane intervened in the action originating in the Southern District of Ohio by filing an intervening suit for damages against Fulks-Graham and the other parties to the underlying action.  *See* Docket No. 7 (Huntoon Aff., Exh. A, Complaint).  According to the privilege log provided by Great Dane, the first email exchange with Exponent, which concerned "the scope of work to be done by Exponent," occurred on June 29, 2009, five days *after* the intervening suit was filed.  *See* Docket No. 13-2 (Hewson Aff., Exh. 2).  Subsequently, on July 7, 2009, Exponent confirmed the

235 F.R.D. at 30-31.

1   scope of technical services to be provided in an engagement letter to Great Dane.  *See* Docket

2   No. 13-1 (Hewson Aff., Exh. 1).  The undisputed sequence of events indicates that Exponent's

3   work for Great Dane was prompted in the first instance by the intervening suit for damages.

4        Second, the affidavit by Great Dane's counsel and the engagement letter both

5   demonstrate that Exponent was hired in anticipation of litigation.  In a sworn affidavit, counsel

6   for Great Dane attests that in July 2009, he retained Exponent on behalf of his firm to provide

7   "technical services and expert advice related to this matter"; that "[b]ased on....three interrelated

8   and inseparable concerns (i.e., compliance with the NHTSA and the Agency regulations,

9   damages arising from the recall with respect to this litigation, and the potential for future

10  personal injury litigation resulting from a fractured kingpin while in service on the national

11  highways), [he] hired Exponent to assist... in formulating [his] opinion so that [he] might provide

12  legal advice to Great Dane about how to best balance these three concerns in the context of the

13  out of specification kingpins which are the subject of this litigation"; and that Exponent was

14  hired "to assist [him]... in representing Great Dane in this case pending in the Southern District

15  of Ohio."  *See* Docket No. 13 (Hewson Aff. ¶¶ 5, 9, 10).  In turn, the engagement letter between

16  Exponent and counsel for Great Dane, dated July 7, 2009, confirms that Exponent was retained

17  to provide counsel with a technical analysis of whether the "Brinell hardness range set by the

18  American Association of Railroads...is appropriate for a tractor-trailer kingpin, or if higher

19  values of hardness may be suitable."  *See* Docket No. 13-1 (Hewson Aff., Exh. 1, Engagement

20  Letter at 1).  The appropriate hardness value of the kingpins appears central to Great Dane's

21  claims in its intervening suit, a fact which Fulks-Graham does not dispute.[8]

22       Third, Great Dane's intervening complaint sets forth how the recall and ensuing litigation

23  are factually and legally intertwined.  Indeed, counsel for Great Dane repeated on the record that

24  Exponent was retained to assist counsel with the instant litigation, in addition to the recall and

25

26

27  _____

28      [8]   In its intervening complaint, Great Dane contends that certain kingpins inspected by
    Fulks-Graham failed to meet Great Dane's hardness specifications and fractured because they
    were too hard.  *See* Docket No. 7 (Huntoon Aff., Exh. A, Complaint ¶¶ 12-17, 19-21).

anticipated private products liability litigation arising from the allegedly defective kingpins.[9]
Exponent's assistance with the recall is "*grounded in the same set of facts that created the...*
*litigation*." *See In re Grand Jury Subpoena (Mark Torf)*, 357 F.3d at 909 (emphasis added).  In
its intervening suit, Great Dane alleges that after defective kingpins were discovered, Great Dane
had a legal obligation to inform the National Highway & Traffic Safety Administration and to
initiate a recall involving the defective kingpins, consequently giving rise to Great Dane's
damages which the company continues to incur as the recall progresses.[10]  *See* Docket No. 7
(Huntoon Aff., Exh. A, Complaint ¶¶ 22-34).  As identified by Great Dane, the litigation purpose
of retaining Exponent "so permeate[d]" the concomitant purpose of assisting with the recall that
"the two purposes cannot be discretely separated from the factual nexus as a whole."  *See In re*
*Grand Jury Subpoena (Mark Torf)*, 357 F.3d at 910.

---

[9]  The Court need not reach the question of whether Exponent was hired in anticipation of prospective products liability litigation since the Court finds for the reasons set forth herein that Exponent was retained in anticipation of the instant litigation pending in the Southern District of Ohio.

[10]  Specifically, Great Dane's complaint alleges, *inter alia*:

- "Under the National Highway & Traffic Safety Act ('NHTSA') and the regulations promulgated pursuant to the NHTSA by the National Highway & Traffic Safety Administration (the 'Agency'), Great Dane has an obligation to inform the Agency within five days of gaining knowledge of a safety-related defect."
- "Pursuant to this obligation, Great Dane informed the Agency of the defect in heat lot NS 919 based on the Second Failure in November, 2008."
- "Pursuant to this obligation, Great Dane informed the Agency of the defect in heat lot PH 958 based on the Third Failure in December, 2008."
- "Pursuant to the applicable Agency regulations, Great Dane was required to commence a recall of all semi-trailers that contained kingpins from heat lots NS 919 and PH 958."
- "Great Dane has incurred and will continue to incur considerable expense to conduct this recall, including, but not limited to the cost of locating and inspecting semi-trailers with kingpins from the suspect heat lots...other expenses of administration of the recall, the cost of testing kingpins in the suspect lots, and the cost of replacing the upper coupler assembly of the trailers with defective kingpins."
- "At the time of filing this complaint, Great Dane has replaced approximately 117 main beam assemblies in semi-trailers containing...defective kingpins.... This number will continue to increase as the recall progresses."

*See* Docket No. 7 (Huntoon Aff., Exh. A, Complaint ¶¶ 22-24, 26, 29, 34).

Nevertheless, Fulks-Graham contends that Exponent was hired by Great Dane *solely* to assist with the recall effort pursuant to Great Dane's independent legal obligations under the NHTSA.  Fulks-Graham asserts (without evidentiary support – *see* footnotes 11 and 13, *infra*), that Exponent's work resulted in expanding the scope of the recall and therefore damages,[11] but that its work was at the same time wholly disconnected from any litigation purpose.  The hard line between the recall and litigation that Fulks-Graham attempts to draw in this case is illusory, precisely because Fulks-Graham concedes that Exponent was hired to assist with the recall, and that the recall, in turn, *is* the basis of Great Dane's damages in the intervening complaint.  This concession by itself demonstrates the link between the recall and ensuing litigation, which are inextricably interrelated concerns.  Thus, the undisputed fact that Exponent was retained after Great Dane filed its complaint to assist both with the recall *and* the litigation brings Exponent's retention within the ambit of the "dual purpose" doctrine of *In re Grand Jury Subpoena (Mark Torf)*.

Next, Fulks-Graham argues that Exponent was not retained for a litigation purpose because its analysis would have been "created in substantially similar form" for the recall, even if the litigation had never occurred.  *See* Docket No. 6 (Opp'n at 6).  The same argument was rejected by the Ninth Circuit in *In re Grand Jury Subpoena (Mark Torf)*, where the government asserted that the documents at issue were not prepared in anticipation of litigation because they would have been "created in substantially similar form" in order to comply with the EPA Information Request.  375 F.3d at 908.  The Ninth Circuit found that this factor, quoted from a Second Circuit case, did not by itself  "eviscerat[e] work product protection" because the protection "cannot be decided simply by looking at one motive that contributed to a document's

---

[11]  The Court notes that there is no evidence in the record to support Fulks-Graham's contention that Exponent's analysis was actually a *basis* for the recall or resulted in *broadening* the scope of the recall.  At oral argument, Fulks-Graham's counsel conceded that he did not have any evidentiary support for this contention, did not know what tests Exponent performed for Great Dane, did not know what the recall decision was in fact based upon, and did not offer any deposition testimony, documents, or interrogatory responses indicating that Fulks-Graham had ever propounded discovery aimed at determining what, if any, role Exponent played in any recall decision.

preparation." *Id.*  Instead, the Ninth Circuit examined the totality of circumstances and whether the litigation and non-litigation purposes were "profoundly interconnected," *id.*, as they are here.

Ancillary to its contention that Exponent was engaged by Great Dane for a truly independent business purpose, Fulks-Graham asserts that Exponent could not have been hired for litigation assistance because the terms of the engagement letter preclude that possibility. Fulks-Graham points to two sections of the engagement letter: the subject line and the section regarding conflicts of interest.  *See* Docket No. 6 (Opp'n at 5); Docket No. 13-1 (Hewson Aff., Exh. 1, Engagement Letter).  The letter's subject line, which reads "Great Dane Kingpin Recall Support," is of no real import.  As articulated above, Exponent's retention served a dual purpose. The engagement letter need not have stated explicitly that Exponent was retained for litigation purposes.  *See*, *e.g*., *Hollinger*,  230 F.R.D. at 521 & n.15.

Of more consequence is the language in the letter regarding Exponent's potential conflict of interest with Indiana Metal Treating, one of the parties sued by Great Dane.  The relevant section of the letter states: "Consistent with our policy of full disclosure, we must inform [Great Dane] that, Exponent has been engaged by Indiana Metal Treating on an investigation related to the litigation aspect of the above subject.  Because of this existing relationship with Indiana Metal Treating, we would have a conflict with any efforts adverse to Indiana Metal Treating and would not assist [Great Dane] in such efforts.  In the event this occurs, Exponent reserves the right to withdraw from participating in this matter....[¶] Exponent staff working on the above noted litigation on behalf of Indiana Metal Treating will not have access to any documents, data, analysis, and reports generated or used as a part of the current investigation. "  Neither party disputes that Exponent proceeded in its consultant relationship with Great Dane for a period of time after the engagement letter, and no evidence has been presented that Exponent subsequently withdrew from such a relationship due to any ethical conflict that later arose.

According to Fulks-Graham, the fact that Exponent continued in its relationship with Great Dane, combined with Exponent's analysis of the Brinell hardness range, a "neutral fact," establish that Exponent viewed its own involvement as litigation-neutral, in support of the recall only.  Otherwise, it would have been necessary for Exponent to withdraw its services due to a

conflict of interest.  *See* Docket No. 6 (Opp'n at 6-7).  Great Dane counters by arguing that if its only intention had been to consult with Exponent for purposes of the recall, it would have been superfluous to provide the names of the parties to the litigation as part of a conflicts check.  *See* Docket No. 10 (Reply at 3).  Great Dane further contends that Exponent's indication that it could not engage in efforts adverse to Indiana Metal Treating "merely explains...that this expert will not be called to testify at trial."  *See id.*  At oral argument, Great Dane's counsel repeatedly represented that no ethical conflict existed because Exponent merely advised Great Dane on a "neutral fact" – the Brinell hardness range – which did not require Exponent to take a position that was adverse to another entity.  That Exponent continued with its services for Great Dane only underscores the absence of an ethical conflict, according to Great Dane.

Neither party cites to any case law in support of its position.[12]  On this issue, the Court finds determinative both parties' characterizations on the record that Exponent's analysis of the Brinell hardness range constituted advice on a "neutral fact" in this case, coupled with the absence of evidence before this Court that Exponent's "neutral" analysis was actually utilized by Great Dane in any manner adverse to Indiana Metal Treating or for that matter, the other parties to the litigation.[13]  Thus, given the lack of proof to the contrary, the terms of the engagement

---

[12]  The Court does not express an opinion on whether Great Dane is correct in its representation that its retention of Exponent was ethically proper.

[13]  Fulks-Graham had asserted in its opposition that Exponent's work for Great Dane determined the "necessity and scope" of the recall, including the decision to expand the recall to cover kingpins from "heat lot 955."  But Fulks-Graham's own argument is internally contradictory and undermined by Great Dane's complaint.  For example, Fulks-Graham admitted in its opposition that "Great Dane's engineering group determined in *May 2009* whether to expand [the] recall" – which thus pre-dates Exponent's retention by two months.  Additionally, Fulks-Graham's averment that it only "recently" discovered in April 2010 that the recall would include heat lot 955 is belied by Great Dane's complaint.  In the intervening suit filed in June 2009 *before Exponent was hired*, Great Dane alleged that it had already "tested two pins that were ultimately determined to be from...heat lot PH 955 that proved to be harder than Great Dane's specifications" and that "[a]s a result, kingpins in...heat lot PH 955 will also be subject to a recall."  *See* Docket No. 7 (Huntoon Aff., Exh. A, Complaint ¶¶ 27-29).  Finally, the deposition testimony cited by Fulks-Graham does not reveal any role played by Exponent in the decision to include lot 955 in the recall.  *See* Docket No. 7 (Huntoon Aff., Exh. B-1, Deposition of Barry Mitchell, 137:21-138:4) (indicating only that this lot had not yet been formally recalled because Great Dane had "asked the *other parties* in the case for information related to the [955] lot

letter are not inconsistent with the sworn statements of Great Dane's counsel that Exponent was hired to provide technical expertise on both the recall and litigation.

In sum, taking into account the totality of circumstances, including the timing of Exponent's retention, the inextricably intertwined nature of the recall and Great Dane's complaint in intervention, counsel's sworn statements, the engagement letter, and the dual purpose role served by Exponent that is permissible under *In re Grand Jury Subpoena (Mark Torf)*, the Court finds that Great Dane has demonstrated Exponent was hired "because of" the litigation it had already initiated against Fulks-Graham and other parties.

2.   <u>Exceptional circumstances.</u>

Because Great Dane has established that Exponent was retained "in anticipation of litigation," Fulks-Graham must prove the existence of exceptional circumstances to justify production of documents otherwise protected from discovery under Rule 26(b)(4)(B).  *See Oki America, Inc.*, 2006 WL 2987022, at *2.  Courts may find exceptional circumstances to order the production of non-testifying expert records when it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by any other means, or the object or condition at issue is destroyed or has deteriorated after the non-testifying expert observes it but before the moving party's expert has an opportunity to observe it.  *See Oki America, Inc.*, 2006 WL 2987022, at *2-3 (noting that "court after court has refused to permit discovery of non-testifying experts" where other means to obtain the information exist); *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1046 (E.D. Cal. 2002); *Vanguard Savings & Loan Ass'n*, 1995 WL 71293, at *3 (finding exceptional circumstances did not exist where defendants were capable of discovering equivalent information through interrogatories to expert witnesses who would address substantially the same issues as those discussed in non-testifying expert report).

Fulks-Graham offers two arguments in support of exceptional circumstances: (1) Exponent conducted "destructive charpy tests on key pieces of evidence" so the only possible way for Fulks-Graham to obtain this information is to review Exponent's test results; and (2) Exponent's work determined the "necessity and scope" of the recall so Fulks-Graham is

and...that's still in process...") (emphasis added).

"without means to obtain complete discovery regarding the factors upon which Great Dane based its decision to report a purported 'safety defect'...to NHTSA and initiate a recall campaign." *See* Docket No. 6 (Opp'n at 7-8).  The Court is not persuaded by either contention.

First, the evidence indicates that Exponent did not conduct any destructive tests on the kingpins, let alone *any* tests.  Eric Guyer, the Senior Managing Engineer for Exponent, submitted a sworn affidavit attesting that Exponent did not conduct any tests on the kingpin remnants.  *See* Docket No. 12 (Affidavit of Eric Guyer ¶ 4).  Charles Fetz, Vice President of Research and Development for a division of Great Dane, attested that Exponent returned all kingpin remnants, which were received by Great Dane "in the exact condition in which they were sent," and that "based on the visual appearance of the returned kingpin remnants, Exponent conducted no tests on the kingpin remnants, including Charpy testing or other destructive testing."  *See* Docket No. 11 (Affidavit of Charles Fetz ¶¶ 5-6).  This evidence is uncontroverted.[14]

Second, other discovery means of obtaining equivalent information exist.  As an initial matter, Fulks-Graham has not submitted any evidentiary support for its claim that Exponent's analysis actually defined the "necessity and scope" of the recall.[15]  Moreover, it is undisputed that Fulks-Graham's own expert has been provided with the opportunity to review the kingpin specimens that were sent to Exponent.  *See* Docket No. 11 (Fetz Aff. ¶ 7) (attesting that all kingpin remnants that had been sent to Exponent were subsequently made available to Fulks-Graham's expert for examination in North Carolina and that Fetz personally traveled with the remnants to meet with Fulks-Graham's expert).  Given this fact, Fulks-Graham has failed to explain why its own expert cannot conduct an analysis of the kingpins.  Nor has Fulks-Graham

---

[14]  Fulks-Graham points to an email chain that merely includes the word "Charpy" but nowhere indicates Exponent engaged in "destructive charpy testing."  *See* Docket No. 7 (Huntoon Aff., Exh. E).  Similarly, the cited deposition testimony of James Nelson, a witness for Great Dane, reveals that he did not think Exponent "did anything" to the kingpins and only that Great Dane was "interested in...the Charpy impact test."  *See* Docket No. 7 (Huntoon Aff., Exh. B-2, Deposition of James Nelson, 107:7-25; 125:17-25).

[15]  *See* footnotes 11 and 13, *supra*.

1   explained why other discovery methods, including interrogatories or depositions, could not have

2   been utilized to obtain information *from Great Dane* about the basis for and scope of the recall.

3   Finally, Fulks-Graham will have the opportunity to conduct discovery against any expert

4   designated by Great Dane to testify about damages from the recall.

5          3.   <u>Waiver under Rule 26(b)(4)(B).</u>

6         Fulks-Graham asserts Great Dane has waived protection under Rule 26(b)(4)(B) because

7   Great Dane previously disclosed "numerous documents detailing Exponent's work" and

8   permitted one of its witnesses to answer questions about Exponent without objection.  *See*

9   Docket No. 6 (Opp'n. at 9).  The Court finds this basis insufficient for Fulks-Graham to meet its

10   burden to prove waiver.  *See Johnson*, 191 F.R.D. at 643.

11         First, the previously disclosed documents are not even at issue.  Great Dane conceded at

12   oral argument that it *voluntarily* produced several documents to Fulks-Graham; Great Dane's

13   counsel represented on the record that these documents were disclosed because they were part of

14   Great Dane's files and comprised "underlying factual documents" or "separate analyses done by

15   one or more of the other parties in the action" – *not* the opinions or analysis of Exponent – which

16   Great Dane is not now seeking to protect or "claw back" from discovery.[16]

17         Second, Fulks-Graham does not cite to a single case to support its contention that

18   *subject-matter* waiver is appropriate here, such that Great Dane should be required to turn over

19   all documents relating in subject matter to those already disclosed.[17]  In this regard, Great Dane

20   asserts that waiver may not even be viable under Rule 26(b)(4)(B), which was "designed to

21   promote fairness by preventing access to an opposing party's trial preparation."[18]  *See* Docket

22

23       [16]  The disclosed documents are marked by an asterisk on Great Dane's privilege log.

24       [17]  In its opposition, Fulks-Graham relies on two inapposite cases, *United States v.*
25   *Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003), and *Central Green Co. v. United States*, CV F 96-
    5541 REC SMS, 2003 U.S. Dist. LEXIS 26526 (E.D. Cal. February 25, 2003), merely to state
26   the general proposition that the "work product doctrine is not absolute."

27       [18]  The Advisory Committee Notes to Rule 26(b)(4) underscore that the drafters of the
    Rule "reject[ed] as ill-considered [court] decisions which have sought to bring expert
28   information within the work-product doctrine" and instead "adopt[ed] a form of the more
    recently developed doctrine of unfairness."  Fed.R.Civ.P. 26 Advisory Committee's Note to

No. 1 (Mot. at 3); Docket No. 10 (Reply at 9).  Indeed, some courts have reasoned that waiver does not apply to Rule 26(b)(4)(B) because it is rooted in the fairness doctrine and is not a species of work product.  *See, e.g., Vanguard Savings & Loan Ass'n*, 1995 WL 71293, at *2 (finding that because Rule 26(b)(4)(B) is not an extension of the work product "privilege" but instead is grounded in the fairness doctrine, waiver argument was therefore "wholly irrelevant" to documents protected under the Rule); *Ludwig v. Pilkington N. America, Inc.*, No. 03 C 1086, 2003 WL 22242224, at *3 (N.D. Ill.  Sept. 29, 2003) (emphasizing that information protected under Rule 26(b)(4)(B) is not subject to waiver because "non-testifying expert information is entirely exempt from discovery not on the basis of privilege, but rather, on the basis of unfairness").

Even when courts have not squarely ruled on whether protection under Rule 26(b)(4)(B) may be waived, courts have been unwilling to find *subject-matter* waiver of a non-testifying expert's undisclosed documents where there has been partial disclosure of the expert's materials – based ultimately on principles of fairness.  *See, e.g., Hollinger*, 230 F.R.D. at 521-22 (commenting that "waiver argument rests on principles of fairness"; noting that Rule 26(b)(4)(B) does not itself address waiver; and declining to extend waiver to the undisclosed portions of a

---

Subdivision (b)(4), 1970 Amendments (citation omitted).  *See also U.S. v. Meyer*, 398 F.2d 66, 73-74 (9th Cir. 1968) (commenting that "the reasons [for rejecting as ill-considered the decisions which have sought to bring expert information within the work product doctrine] seem clear"); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 116 F.R.D. 533, 539 (N.D. Cal. 1987) (stating that "[t]he work that retained experts do in anticipation of litigation is not work product and its discoverability is governed by a separate rule [26(b)(4)]"), *abrogated on other grounds by Advanced Cardiovascular Systems, Inc. v. C.R. Bard, Inc.*, 144 F.R.D. 372, 374 (N.D. Cal. 1992); *Klee v. Whirlpool Corp.*, 251 F.R.D. 507, 511 (S.D. Cal. 2006) (stating that one purpose of Rule 26(b)(4)(B) is to "promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation") (citations omitted); *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1048 (E.D. Cal. 2002) (same).  *See generally*, 8A Charles A. Wright, Arthur R. Miller, Mary K. Kane & Richard L. Marcus, Federal Practice and Procedure § 2029 (3d ed. 2010) (stating that "[t]he knowledge of an expert is not privileged, [and] it is not part of the work product..."); Jack H. Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan. L. Rev. 455, 488 (1962) (concluding that "the work product doctrine should [not] be extended to cover expert information which [it] normally would not protect" and that "[i]f such discovery is to be denied, it should be done on the ground that disclosure would be unfair under the particular facts of the case").

non-testifying expert's report and to all other documents involving the same subject matter, even where portions of expert's findings had already been disclosed); *In re PolyMedica Corp.*, 235 F.R.D. at 32-33 (commenting that "[w]hether the protection of Rule 26(b)(4)(B) can be waived at all is a difficult question"; stating that "[t]he... concern for fairness underlies the treatment of discovery of experts under [Rule] 26(b)(4)"; and denying waiver of underlying documents on same subject matter where non-testifying expert report had been disclosed because there was no evidence that defendants sought to use disclosed report as both "sword and shield" in any judicial proceeding) (internal citation omitted). *See also*, *Ludwig*, 2003 WL 22242224, at *3 (finding that even if doctrine of waiver applied to Rule 26(b)(4)(B), any waiver is limited to material disclosed and does not apply to undisclosed material).

Here, the Court need not resolve the question of whether waiver is even possible under Rule 26(b)(4)(B). Even assuming *arguendo* that the doctrine of waiver applies to Rule 26(b)(4)(B), the facts of this case do not support subject-matter waiver. This Court is ultimately guided by the same fairness analysis utilized by other courts that have specifically examined the issue of subject-matter waiver under Rule 26(b)(4)(B). Accordingly, the Court finds that Fulks-Graham has not demonstrated why it would be unfair to limit disclosure to the documents already produced by Great Dane. Great Dane represented at the hearing that the documents it previously disclosed are underlying factual documents in this case, and not the opinions or reports of Exponent; none of the evidence presented by Fulks-Graham contradicts this representation. The deposition excerpts, the engagement letter, the email chain with Exponent regarding shipping logistics, and the other disclosed documents listed on Great Dane's privilege log do not indicate that the substance of Exponent's work has been partially revealed.[19] Thus, there is no indication in the record that Great Dane has attempted to use Exponent's work as both a "sword and a shield" by making use of some documents setting forth Exponent's analysis yet

---

[19] For example, Fulks-Graham points to the deposition of James Nelson, a Great Dane witness. *See* Docket No. 6 (Opp'n at 3, 9). However, the deposition excerpts merely indicate that Nelson identified Exponent as a third-party consultant for Great Dane and that he did not have personal knowledge of the work performed by Exponent. *See* Docket No. 7 (Huntoon Aff., Exh. B-2, Nelson Depo., 105:19 -109:3).

1    withholding the rest to shelter unfavorable evidence.  Because Fulks-Graham has not established

2    any basis for subject-matter waiver, the Court finds that Great Dane has not waived protection

3    under Rule 26(b)(4)(B) of the documents it has not previously disclosed.

4    **B.    Fed.R.Civ.P. 26(b)(3) and Work Product Protection.**

5           In order to qualify for work product protection under Rule 26(b)(3), documents must

6    possess two characteristics: (1) they must be "prepared in anticipation of litigation or for trial"

7    and (2) they must be prepared "by or for another party or by or for that other party's

8    representative." *In re Grand Jury Subpoena (Mark Torf)*, 357 F.3d at 907 (quoting Fed.R.Civ.P.

9    26(b)(3)) (citation omitted).  The burden is on the party seeking to withhold documents under the

10   work product doctrine to show that it applies.  *Baxter Healthcare Corp. v. Fresenius Med. Care*

11   *Holding, Inc.*, No. C 07-1359 PJH (JL), 2008 WL 5214330, at *3 (N.D. Cal. Dec. 12, 2008);

12   *Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786 JSW (EMC), 2004 WL 1878209, at *5

13   (N.D. Cal. Aug. 23, 2004).  A party may satisfy this burden by submitting affidavits showing

14   that certain facts exist to support the work product protection or by providing a privilege log

15   describing the documents for which a protection is claimed.  *Baxter Healthcare Corp.*, 2008 WL

16   5214330, at *3.

17          1.     <u>"In anticipation of litigation."</u>

18          As under Rule 26(b)(4)(B), Fulks-Graham's sole argument against work product

19   protection is that the document at issue was not prepared in anticipation of litigation.  The single

20   document for which Great Dane seeks work product protection is described in the privilege log

21   as an "[e]mail [dated April 1, 2010] from John Hewson [counsel for Great Dane] to Eric Guyer

22   [Senior Managing Engineer of Exponent] regarding [Great Dane's] request to [Fulks-Graham] to

23   withdraw subpoena."  *See* Docket No. 13-2 (Hewson Aff., Exh. 2).  Based on the description of

24   the email, its date of creation, and the identity of its author, the Court finds this email is a "single

25   purpose" document that was clearly created because of the pending litigation.  *See In re Grand*

26   *Jury Subpoena (Mark Torf)*, 357 F.3d at 907; *Visa U.S.A.,* 2004 WL 1878209, at *6 (stating that

27   "[t]he 'because of' standard is not difficult to apply when a document has been prepared

28   exclusively in anticipation of litigation").

2.   Substantial need.

Because Great Dane has established that the email was created "in anticipation of litigation" to trigger work product protection, Fulks-Graham must show it has a substantial need for the document and that it cannot without undue hardship obtain its substantial equivalent by other means. *See In re Grand Jury Subpoena (Mark Torf)*, 357 F.3d at 906; *Visa U.S.A.,* 2004 WL 1878209, at *5. Fulks-Graham did not specifically argue the existence of substantial need. Given the nature of this document, Fulks-Graham's arguments under exceptional circumstances (relating to destructive testing and the inability to obtain information underlying the recall decision) do not make sense to import here. Thus, Fulks-Graham has not contended and cannot demonstrate that a substantial need exists for this document.

3.   Waiver of work product protection under Rule 26(b)(3).

As the party asserting waiver of work product, Fulks-Graham must prove facts necessary to support a finding of waiver. *See In re Convergent Techs. Second Half 1984 Securities Litig*., 122 F.R.D. 555, 565 (N.D. Cal. 1988). The parties do not dispute that the single work product document has *not* been disclosed. At oral argument, Fulks-Graham generally argued that due to Great Dane's partial disclosure of other documents, all documents related in subject-matter should be disclosed. However, Fulks-Graham did not argue that waiver should apply to this email, and the Court does not find any basis for waiver demonstrated here.

**III.  CONCLUSION**

For the foregoing reasons, Great Dane's Motion to Quash is GRANTED, and Fulks-Graham's request for an *in camera* inspection of documents is DENIED.

IT IS SO ORDERED.

DATED: July 12, 2010

_____
DONNA M. RYU
United States Magistrate Judge